**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

RAYMUNDO ALBERTO FUENMAYOR
PEROZO, an individual;  BERENICE SOTELO
GODOY, an individual; MATTEO
FUENMAYOR SOTELO, and DANNA PAOLA
FUENMAYOR SOTELO, an individual

        Plaintiffs,

vs.

JOSEPH B. EDLOW, Director of U.S.
Citizenship and Immigration Services; KRISTI
NOEM, Secretary of U.S. Department of
Homeland Security, U.S. DEPARTMENT OF
HOMELAND SECURITY; PAMELA BONDI,
Attorney General of the United States; and
JASON A. REDING QUIÑONES, United States
Attorney for the Southern District of Florida
        Defendants.

Case No.: 1:25-cv-25607-JB

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR
EXPEDITED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, Raymundo Alberto Fuenmayor Perozo ("Raymundo"), Berenice Sotelo Godoy

("Berenice"), Matteo Fuenmayor Sotelo ("Matteo"), and Danna Paola Fuenmayor Sotelo

("Danna") (collectively, "Plaintiffs"), by and through undersigned counsel, hereby file this Notice

of Supplemental Authority of the decision issued in *Karimi v. Mullin, et al.*, Case No. 5:26-CV-

5049, U.S. District Court for the Western District of Arkansas (Apr. 23, 2026), 2026 U.S. Dist.

LEXIS 89358, attached hereto as **Exhibit 1**.

In *Karimi*, the court **granted** a very similar Motion for Preliminary Injunction to the one

filed by the Plaintiffs here at ECF No. 18 enjoining Defendants from applying the USCIS Policy

Memorandums, which are the subject of this lawsuit, and directing Defendants to adjudicate the

Plaintiffs' Forms I-526E, I-485, I-765, and I-131.  Notably, the *Karimi* court found that the Plaintiff there had a likelihood of success on the merits of his APA (unlawfully withheld agency action, unreasonable delay, and arbitrary and capricious) claim asserted by the Plaintiffs in their Amended Complaint at ECF No. 17.  Accordingly, *Karimi* supports Plaintiffs' position that their Expedited Motion for Preliminary Injunction should be granted *in toto*.

Dated: April 24, 2026

Respectfully submitted,

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
1200 Brickell Avenue, Suite 700
Miami, Florida 33131
E-mail: rodrigo@rdasilvalaw.com
Telephone:    (305) 615-1434
Facsimile:    (305) 615-1435

By: /s/ *Rodrigo S. Da Silva*
Rodrigo S. Da Silva, Esq.
*Counsel for Plaintiffs Raymundo Alberto Fuenmayor Perozo, Berenice Sotelo Godoy, Matteo Fuenmayor Sotelo and Danna Paola Fuenmayor Sotelo*

# EXHIBIT 1

# Karimi v. Mullin

United States District Court for the Western District of Arkansas, Fayetteville Division

April 23, 2026, Decided

CASE NO. 5:26-CV-5049

**Reporter**

2026 U.S. Dist. LEXIS 89358 *; 2026 LX 287234

MIRHOSSEIN MOUSAVI KARIMI PLAINTIFF V. MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; JOSEPH B. EDLOW, Director, U.S. Citizenship and Immigration Services; and TODD BLANCHE, Acting Attorney General DEFENDANTS

**Notice:** Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.

## Opinion

 [*1] **MEMORANDUM OPINION AND ORDER**

Now before the Court is Plaintiff Mirhossein Mousavi Karimi's Motion for Preliminary Injunction and brief in support (Docs. 10 & 10-2). Defendants Markwayne Mullin, 1 Joseph Edlow, and Todd Blanche (collectively, the "Government") have filed a response in opposition (Doc. 13) and supplemental declarations from two U.S. Citizenship and Immigration Services ("USCIS") employees (Doc. 18). The Court held a hearing on the Motion on April 6, 2026. For the reasons that follow, the Motion is **GRANTED IN PARTand DENIED IN PART**.

### I. BACKGROUND

This case is about a recent USCIS policy to withhold adjudication of pending benefit requests from nationals of certain countries (the "Hold Policy" or the "Policy"). Mr.

Karimi is a national of one such country, Iran, and he has been awaiting adjudication of his application for employment authorization since October. He is currently without legal authorization to work in the United States and will remain unable to lawfully hold employment unless and until his application is granted.

1 Under Fed. R. Civ. P. 25(d), when a public officer sued in their official capacity ceases to hold office while an action is pending, "[t]he officer's successor is automatically [*2]  substituted as a party."

1

### A. Mr. Karimi's Immigration History

Mr. Karimi is a citizen of Iran but currently resides in Rogers, Arkansas. (Doc. 10-

1, ¶ 2). He entered the United States in August of 2019 on a student visa and has remained continuously and lawfully present in the U.S. since then. *Id.* ¶ 3. While studying in the U.S., he earned a Ph.D. in Computer Science and began employment as a data scientist at Walmart. *Id.* ¶¶ 5-6.

Mr. Karimi holds a National Interest Waiver which was approved in December of

2023. Generally, employment-based visas for aliens "holding advanced degrees" must be

"sought by an employer in the United States." 8 U.S.C. § 1153(b)(2)(A). However, this so-called "job offer requirement" may be waived via a National Interest Waiver "when the Attorney General deems [waiver of the job offer requirement] to be in the national interest." *Id.* § 1153(b)(2)(B)(i). Under USCIS policy, to receive a National Interest Waiver,

Mr. Karimi had to (and did) demonstrate by a preponderance of the evidence that: (1) his "proposed endeavor has both substantial merit and national importance;" (2) he "is well positioned to advance the proposed endeavor;" and (3) "on balance, it would be beneficial to the United States to waive [*3]  the requirements of a job offer . . . ." *Matter of Dhanasar*, 26

I. & N. Dec. 884, 889 (2016).

In June of 2025, Walmart timely filed an H-1B change of status petition on Mr.

Karimi's behalf. (Doc. 10-1, ¶ 11). The H-1B program permits an employer to import a foreign worker "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b). A specialty occupation is "an occupation that requires[:] **(A)** theoretical and practical application of a body of highly specialized knowledge, and **(B)** attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United

2

States." 8 U.S.C. § 1184(i)(1). Mr. Karimi was previously authorized to work in the U.S. under an employment authorization related to his student visa; that employment authorization was automatically extended through April 1, 2026, with Walmart's filing of the H-1B petition, and Mr. Karimi remained employed at Walmart until that date. 8 C.F.R.

§ 214.2(f)(5)(vi).

On October 16, 2025, Mr. Karimi filed Form I-485, Application to Register

Permanent Residence or Adjust Status, and Form I-765, Application for Employment Authorization. (Doc. 10-1, ¶ 8). He completed the required biometric appointment on November 21. [*4]  *Id.* ¶ 9. USCIS has not sought additional information from him since his applications were filed. *Id.* ¶ 10. Without approval of his Form I-765 before April 1, Mr. Karimi is no longer able to hold lawful employment in the United States and is, accordingly, no longer employed by Walmart.

**B. Adjudicatory Hold Policy**

Adjudication of Mr. Karimi's Form I-765 is being withheld pursuant to USCIS Policy Memoranda PM-602-0192 and PM-602-0194. 2

On January 20, 2025, President Trump's first day in office, he issued Executive

Order 14161 which directs heads of immigration agencies to "vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks." Exec. Order No. 14161, 90 Fed. Reg. 8451, 8451 sec. 2(a)(iv) (Jan. 20,

2https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf                    [https://perma.cc/S63F-ELJK]; https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf [https://perma.cc/5ES9-

YRYA].

3

2025). On June 4, President Trump issued Presidential Proclamation 10949, [*5]  which suspends entry into the United States of nationals of twelve countries including Iran. Proclamation No. 10949, 90 Fed. Reg. 24497, 24500 sec. 2(h) (June 4, 2025).

On December 1, 2025, USCIS issued Policy Memorandum PM-602-0192 ("PM-

0192") which, in reliance on Executive Order 14161 and Proclamation 10949, directs

USCIC personnel to "[p]lace a hold on pending benefit requests for aliens from countries listed in" Proclamation 10949 "pending a comprehensive review, regardless of entry date." PM-0192, at 1. "This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum." *Id.* at 2-3. PM-0192 represents that USCIS would, "[w]ithin

90 days of issuance," "prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance." *Id.* at 3. If it did so, any such list or operational guidance has not been made public or disclosed to the Court.

On December 16, 2025, the President issued Presidential Proclamation 10998 declaring the continued suspension of entry into the United States of nationals of the twelve countries identified in Proclamation 10949 [*6]  and adding several new countries to the list. Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 16, 2025). On January 1,

2026, USCIS issued a second Policy Memorandum, PM-602-0194 ("PM-0194"), which extended the hold on pending benefit applications to aliens of countries identified in

Proclamation 10998 and directed USCIS personnel to "conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998." PM-0194, at 1. PM-0194 also describes the

4

required "hold" as follows: "A 'hold' allows a case to proceed through processing, up to final adjudication. A 'final adjudication' refers to the issuance of a final decision on a case, such as an approval, denial, or

dismissal." *Id.* at 1 n.2. Like PM-0192, PM-0194 states that the hold "will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum or memorandum attachment." *Id.* at 3.

PM-0194 also creates exceptions to the Hold Policy for certain benefit requests,

including: Form I-765 applications filed by certain asylum seekers under 8 C.F.R.

§ 274a.12(c)(8) or filed by law enforcement on behalf of certain aliens under

§ 274a.12(c)(11) and (c)(14) "because the alien is assisting law enforcement"; and

"[b]enefit [*7] requests filed by aliens whose entry would serve a United States national interest." *Id.* at 5. PM-0194 again represents that USCIS would prioritize a list for review and issue operational guidance within 90 days. *Id.* On March 30, 2026, USCIS released an "update" that did not end the hold. USCIS, *Update on UCSIS' Strengthened Screeningand Vetting* (March 30, 2026) [hereinafter *Update*]. *3* USCIS is still in the process of

"developing guidance to help adjudicators align interview resources to specific risks identified for each country." *Id.*

Mr. Karimi contends that his Form I-765 has been processed and is only awaiting final adjudication, which is being withheld based on the Hold Policy. He has submitted a screenshot from a chat on the USCIS website inquiring about his application. (Doc. 10-

4). The Government representative says "Our records show that your case is currently pending adjudication." *Id.* Congressman Steve Womack's office also contacted USCIS on

3https://www.uscis.gov/newsroom/alerts/update-on-uscis-strengthened-screening-and-vetting [https://perma.cc/KT6R-BXQR].

5

Mr. Karimi's behalf, and USCIS responded by outlining the Hold Policy; the response

strongly suggests but does not state [*8] outright that a decision on Mr. Karimi's application is

being withheld because of the Policy. (Doc. 10-3). The Government's attorney represents

that Mr. Karimi's application is still being processed and even if it eventually reaches the

point at which the Hold Policy kicks in, it is not there yet. He offers the declaration of

USCIS Associate Portfolio Director Christopher A. Humphries, who says "Plaintiff's I-765

application is pending" and "USCIS is continuing to process Plaintiff's application

following all statutes, regulations, policies, and procedures." (Doc. 18-1). The Court

concludes that Mr. Karimi's application has more likely than not been fully processed and

remains pending only because of the Policy. Mr. Humphries's ambiguous declaration does

not provide evidence to the contrary.

## II. JURISDICTION

The Government asserts that the Court lacks jurisdiction over Mr. Karimi's case because Mr. Karimi has not established Article III standing, this dispute is subject to the Immigration and Nationality Act's jurisdictional bar, and the Policy is not a final decision subject to review under the Administrative Procedure Act.

### A. Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." [*9]  Accordingly, a plaintiff must have "standing" to bring a lawsuit in federal court.

[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent

action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified).

The Government argues that Mr. Karimi has failed to make out the third requirement, redressability. "Even if the Court ordered Defendants to adjudicate Plaintiff's application, the agency could deny it, which would not prevent the alleged loss of employment." (Doc. 13, p. 9). This argument is without merit: "those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision [*10]  upon an improper legal ground" even if the agency "might later, in the exercise of its lawful discretion, reach the same result for a different reason." *Fed. ElectionComm'n v. Akins*, 524 U.S. 11, 25 (1998). Mr. Karimi does not have to prove a likelihood that USCIS will ultimately rule in his favor in order to establish standing to challenge the allegedly unlawful Policy under which his application is being handled.

### B. Statutory Subject-Matter Jurisdiction

"Federal courts below the Supreme Court level have only such jurisdiction as is given them by Congress. The Power of Congress to confer jurisdiction carries with it the power to remove jurisdiction." *Chen v. Immigr. & Naturalization Serv.*, 418 F.2d 209, 209 (8th Cir. 1969). The Government contends that the Immigration and Nationality Act ("INA") deprives the Court of jurisdiction to hear this case and that the Administrative Procedure

Act's ("APA") grant of jurisdiction does not apply because the challenged Policy is not a final decision.

### *1. INA Jurisdictional Bar*

Congress can take away federal courts' jurisdiction to hear cases and has done so in the INA. 8 U.S.C. § 1252(a)(2)(B)(ii) provides: "no court shall have jurisdiction to review

7

. . . any other decision or action of the Attorney General or the Secretary of Homeland

Security the authority for which is specified under this subchapter [*11] to be in the discretion of the Attorney General or the Secretary of Homeland Security." Interpreting this provision, the Eighth Circuit held: "Two elements trigger § 1252(a)(2)(B)(ii)'s jurisdictional bar: (1) a decision or action by the Attorney General or the Secretary of Homeland Security and (2) statutorily specified discretion under Subchapter II of Chapter 12 of Title 8 (8 U.S.C.

§§ 1151-1381) (Subchapter II)." *Thigulla v. Jaddou*, 94 F.4th 770, 774 (8th Cir. 2024). In Thigulla, two immigrants seeking to become lawful permanent residents (also

known as green-card holders) were delayed at the last step, USCIS approval of their Form

I-485 applications for adjustment of status, by a USCIS hold policy. *Id.* at 771-73. The Eighth Circuit dismissed their case for lack of subject-matter jurisdiction because a provision of Subchapter II, § 1255(a), provides that an alien "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if" certain requirements are met. *Id.* at 775, 777. This provision, the Eighth Circuit found, "establishes the Attorney General's 'discretion' both to adjust applicants' statuses, even after the applicants meet the statutory requirements, and to enact 'such regulations as he may prescribe' to administer this process." *Id.* at 775. Because the [*12] hold plaintiffs were subject to was within the Attorney General's discretion to prescribe regulations, § 1252(a)(2)(B)(ii) deprived the court of jurisdiction.

Mr. Karimi is not seeking to compel a ruling on his application for adjustment of status, Form I-485. Section 1255(a) does not supply the universal governing framework for adjudication of employment authorization via Form I-765. Indeed, Form I-765

8

applications are filed by many people who are not seeking lawful permanent resident status. Some people have employment authorization "incident to status": based on their immigration status, they are statutorily entitled to employment authorization, and Form I-

765 is used to seek an Employment Authorization Document ("EAD") showing proof of such authorization which the Attorney General is required to issue. *See* 8 U.S.C.

§ 1184(p)(3)(B) ("With respect to nonimmigrant aliens [holding U-Visas] . . . the Attorney

General shall, during the period those aliens are in lawful temporary resident status under that subsection, provide the aliens with employment authorization."). For other people, Congress has conferred discretion on the Attorney General to determine their employment authorization and promulgate regulations

governing the same. *See* 8 U.S.C. § 1158(d)(2) ("An [*13] applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General.").

With narrow exceptions not relevant here, 4 Subchapter II says nothing about people with pending Form I-485 applications who seek employment authorization. While silence may have the practical effect of conferring discretion, silence does not constitute "statutorily specified discretion under Subchapter II." *Thigulla,* 94 F.4th at 774. Accordingly, 8 U.S.C. § 1252(a)(2)(B)(ii)'s jurisdictional bar does not apply here. *Accord*

*Bowser v. Noem,* 2026 WL 555624, at *3-4 (D. Mass. Feb. 27, 2026); *Varniab v. Edlow,*

2026 WL 485490, at *8 (N.D. Cal. Feb. 20, 2026).

4 *See* § 1255 note (the Secretary "shall authorize employment" for qualifying nationals of certain countries whose "application for adjustment of status . . . is pending for a period exceeding 180 days and has not been denied"); *see also* Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the* United States Code, 122 L.

Library J. 213 (2020).

9

## *2. APA Final Decision*

Under the APA, "final agency action[s] for which there is no other adequate remedy

in a court are subject to judicial review." 5 U.S.C. § 704. The Government contends that

the Policy is not final agency action and is therefore not subject to judicial review under

the APA.

As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation [*14] of the agency's decisionmaking process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (citation modified). The Government

asserts that the Policy is not final because the memoranda "expressly contemplates

further agency action." (Doc. 13, p. 14). USCIS did provide an update within 90 days after

PM-0194-but that update did not lift the hold. *See Update.* Instead, USCIS is still working

"to recommend improvements." *Id.*

As Mr. Karimi highlights, the memoranda state that the "hold will remain in effect

until lifted by the USCIS Director through a subsequent memorandum." PM-0192, at 2-

3; PM-0194, at 3. The Government's attorney knew nothing about when such a memorandum might be expected, and the Court concludes that the policy imposes an indefinite hold.

On the first prong, the Court finds that the first Policy Memorandum marks the consummation of the agency's decisionmaking process. It describes a policy decision that has been made by USCIS and directs USCIS personnel to comply with the selected policy. "USCIS **has determined** that the burden of processing [*15] delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security." PM-0192, at 3 (emphasis added). Its command is unequivocal: "Effective immediately, this memorandum **directs**

**U.S. Citizenship and Immigrations Services (USCIS) personnel** to . . . Place a hold on pending benefit requests for aliens from countries listed in *Presidential Proclamation*

*(PP) 10949* . . . pending a comprehensive review, regardless of entry date." *Id.* at 1.

(emphasis added) (footnotes omitted).

The Government's argument that the policy is nonfinal because it contemplates future change is unpersuasive, to say the least. "Th[e] possibility [that an agency may revise a decision] is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). Even our Constitution contemplates future change. *See* U.S. Const. art. V.

While change is always possible, a binding order on USCIS personnel, imposed until the USCIS says otherwise, meets the first prong under Bennett. *See Biden v. Texas*,

597 U.S. 785, 808-09 (2022) (holding that Secretary of Homeland Security's memoranda constituted final agency action where they "bound DHS staff [*16] by forbidding them to continue the program in any way from that moment on" (citation omitted)). Moreover,

USCIS's most recent word on the Policy, the March 30 Update, maintains the Hold Policy and does not offer a timeline for further action to modify or lift it.

On the second prong, the Government argues that a memorandum like the ones at issue here has no "direct and appreciable legal consequences" because "it does not require anyone to do anything." (Doc. 13, p. 14 (quoting *Cal. Cmtys. Against Toxics v.Env't Prot. Agency*, 934 F.3d 627, 640 (D.C. Cir. 2019))). The Government skips over the

obligations the policy imposes on USCIS personnel and claims there are no legal consequences here because "no alien applicants' rights or obligations have been determined." *Id.* at p. 15.

An agency's decision need not bind the ultimately regulated party to have direct and appreciable legal consequences. For example, in Hawkes, the Supreme Court examined jurisdictional determinations ("JD") made by the U.S. Army Corps of Engineers about whether a particular property contains "waters of the United States" which are subject to the Clean Water Act. 578 U.S. at 593. The Court concluded that the second prong of Bennett was met because the Corps' determination that "a property does *not* contain jurisdictional waters-a 'negative' [*17] JD . . . will generally bind the Corps for five years" and "will also be binding on the Government, . . . creating a five-year safe harbor from [Government-initiated] proceedings for a property owner." 578 U.S. at 598-99 (citation modified). Although the negative JD bound the Government, not the property owner, the second prong was satisfied such that the property owner could sue under the

APA because the obligation placed on the Government provided a legal benefit to the property owner.

Here, the Policy obligates USCIS to do something: place a hold on all pending benefit requests for aliens from certain countries. While the Policy binds USCIS, not the aliens themselves, the Policy has direct and appreciable consequences for those aliens by denying them the ability to receive legal benefits that they may otherwise have been granted. The second prong is therefore satisfied. *See Bowser*, 2026 WL 555624, at *6;

*New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025) (collecting cases) ("Courtshave regularly determined that this condition is satisfied when an indefinite pause is

imposed by an agency."). Accordingly, the Hold Policy constitutes final agency action reviewable under the APA.

## III. PRELIMINARY INJUNCTION

"Whether a preliminary injunction should issue involves consideration of (1) [*18] the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*

*Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

### A. Likelihood of Success on the Merits

The standard for likelihood of success on the merits varies based on the kind of action challenged; usually the movant must show only a "fair chance of success," but if he challenges government regulation "based on [a] presumptively reasoned democratic process[ ]," then he must show make the more rigorous showing that he is "likely to prevail on the merits." *Firearms Regul. Accountability Coal., Inc. v. Garland,* 112 F.4th 507, 517

(8th Cir. 2024) (citation omitted). The parties assume that the heightened standard for government regulations applies.

### 1. Unlawful Withholding

Under the APA, reviewing courts "shall compel agency action unlawfully withheld."

5 U.S.C. § 706(1). The Mandamus Act, 28 U.S.C. § 1361, grants the district courts

"original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "Mandamus may issue under section 1361 against an officer of the United States only when the plaintiff [*19] has a clear right to relief, the defendant has a clear duty to perform the act in question, and the plaintiff has no adequate alternative remedy." *Longie v. Spirit*

13

*Lake Tribe*, 400 F.3d 586, 591 (8th Cir. 2005). The Government urges that mandamus is not available to control the timing of agency decisions, and, as a practical matter, the Court entering an order setting a deadline for USCIS to adjudicate Mr. Karimi's application would control timing. But the Supreme Court has long recognized that, even with respect to discretionary actions, "§ 706(1) empowers a court only to compel an agency . . . to take action upon a matter, without directing how it shall act." *Norton v. S. Utah Wilderness All.*,

542 U.S. 55, 64 (2004) (citation modified). That is what Mr. Karimi asks for here.

The Government does not deny that USCIS has a duty to adjudicate properly filed Form I-765 applications. It claims this is just a dispute about the timeline for such adjudication. But the Policy does not merely delay adjudication of Form I-765 applications-it forecloses such adjudication indefinitely. "As emphasized by one court, there is a difference between the [USCIS]'s discretion over *how* to resolve an application and the [USCIS]'s discretion over *whether* it resolves an application." *Singh v. Still*, 470

F. Supp. 2d [*20] 1064, 1067 (N.D. Cal. 2007). Here, the Government frames this as a "how" question, but the Policy clearly imposes a "whether" decision; under the Policy, USCIS personnel cannot adjudicate Form I-765 applications for applicants from the designated countries at all until the Policy is lifted at some indefinite point in the future. This "whether" decision is not within the agency's discretion and contradicts USCIS's clear duty to adjudicate the applications properly before it. The Policy, as applied to Mr. Karimi, likely constitutes unlawful withholding under the APA from which Mr. Karimi has a clear right to relief and no alternative avenues to seek such relief. Mr. Karimi is likely to succeed on his unlawful withholding claim.

14

### 2. Unreasonable Delay

Under the APA, "each agency shall proceed to conclude a matter presented to it

. . . within a reasonable time," and reviewing courts "shall compel agency action . . .

unreasonably delayed." 5 U.S.C. §§ 555(b), 706(1). The parties agree that Plaintiff's unreasonable delay claim is governed by the factors set out in *TelecommunicationsResearch & Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). The *TRAC* factors are:

1. the time agencies take to make decisions must be governed by a "rule of reason";

2. where Congress has provided a timetable [*21] or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

3. delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4. the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

5. the court should also take into account the nature and extent of the interests prejudiced by delay; and

6. the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

Id. at 80 (citations omitted).

"It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application . . . ." 8 U.S.C. § 1571(b). While this provision is aspirational, not prescriptive, it does provide an indication of the speed with which Congress expects the agency to proceed. The Government says that even when it exceeds 180 days, it follows a rule of reason because it "generally adjudicates I-485 and I-765 applications in the order they

are received." [*22] (Doc. 13, p. 17). And USCIS regularly exceeds the 180-day period

15

suggested by Congress: while the median processing time so far in fiscal year 2026 is

4.3 months (129 days), 20% of cases adjudicated in the last 6 months took longer than 9.5 months (285 days). *Historical National Median Processing Time (in Months) for All*

*USCIS Offices for Select Forms by Fiscal Year*, USCIS (up to Feb. 28, 2026); *Case*

*Processing Times*, USCIS (accessed Apr. 20, 2026). *5* It is not clear to what extent the

Policy has contributed to these processing times which, for Form I-765 applicants across classifications (with the exception of asylum seekers), have increased substantially since 2025.

Mr. Karimi's application hit the 180-day mark on April 14, 2026. It has been pending longer than the median application, but not as long as the slowest 20% of applications. While an adjudication period in excess of Congress's recommendation does not necessarily indicate an unreasonable delay, USCIS's timing should still be governed by a rule of reason. The general rule that applications are processed in the order they are received is such a rule-but the Policy creates an exception to that rule, pulling applicants out of line [*23] and delaying adjudication of their benefit requests indefinitely. The Government has provided no information about how the line operates now that people like Mr. Karimi have been taken out, instead suggesting without evidence that Mr. Karimi is trying to cut the line. But Mr. Karimi's evidence indicates that, if not for the hold, he would be at the front. "It appears that if and when Plaintiff[

] receive[s] final adjudication of [his] application[ ], it will be after some later-filed applications submitted by applicants from

5        https://egov.uscis.gov/processing-times/historic-pt        [https://perma.cc/E46B-M3B9]; https://egov.uscis.gov/processing-times/ [https://perma.cc/GT77-X522] (Form: I-765 | Application for Employment Authorization; Form Category: Based on a pending I-485 adjustment application [(c)(9)]; Field Office or Service Center: Service Center Operations

(SCOPS).

other countries that are not on hold." *Varniab*, 2026 WL 485490, at *13. USCIS is not following its asserted rule of reason with respect to Mr. Karimi's application, and it has exceeded Congress's suggested timeline based on its unreasonable new rule. These factors favor Mr. Karimi.

*TRAC* factor three considers the stakes of the delay and overlaps with [*24] factor five which considers the nature and extent of the interests prejudiced by delay. Mr. Karimi points to the loss of ability to maintain lawful employment, especially his particular position at Walmart, as more than just threatened "temporary financial loss," but also harm to his "professional reputation, future employment prospects, and career trajectory." Having already lost his job at Walmart, the stakes related to that particular position are now reduced, but the Policy continues to indefinitely foreclose Mr. Karimi's ability to lawfully work in any job in the United States, which plainly threatens his welfare. As the court in

*Varniab* recognized, the unavailability of an EAD under the Policy means Mr. Karimi

"would not only suffer lost wages but would lose the legal ability to work at all . . . . He could not simply find another job, as he would be categorically barred from lawful employment." *Id.* at *22 (citation modified). The stakes of the Policy for Mr. Karimi's health and welfare, and his interest in earning a livelihood weigh in favor of finding an unreasonable delay.

The import of the fourth *TRAC* factor, the effect of expediting delayed action on competing agency priorities, depends [*25] on where Mr. Karimi's application falls in the line of

Form I-765 applicants awaiting adjudication. As the Court previously stated, the evidence indicates that Mr. Karimi's application has been processed and is only being delayed because the Policy prevents final adjudication. The Court can only speculate about

whether Mr. Karimi's application would already have been adjudicated if not for the Policy because the Government's attorney was unable to offer any information about how long adjudication ordinarily takes once an application is fully processed. With so little information, this factor does not weigh in favor of either party.

Finally, the sixth *TRAC* factor tells the Court that it need not find impropriety to find an unreasonable delay, and the Court therefore does not reach a conclusion about whether the delay in this case is improper, or just unreasonable.

The first two factors heavily favor Mr. Karimi, and the third and fifth factors also support his unreasonable delay claim. The Government cannot rely on the fourth factor for support because the information necessary to ascertain its weight is within USCIS's knowledge but has not been produced. And the sixth factor does not [*26] weigh against finding unreasonable delay. Accordingly, Mr. Karimi is likely to succeed on his unreasonable delay claim under the APA.

### 3. Arbitrary and Capricious

Finally, the APA states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.

Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Generally, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579

18

U.S. 211, 221 (2016). "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 221-22. Accordingly, "a reasoned explanation is needed for disregarding facts [*27] and circumstances that underlay or were engendered by the prior policy." *Id.* at 222 (citation omitted). The agency must also "consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v.*

*Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Here, USCIS failed to provide a reasoned explanation for disregarding the circumstances engendered by its longstanding prior policy and failed to consider alternatives within the ambit of the existing policy.

The background section of PM-0192 states "the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people" and points to two incidents of planned or completed violence involving Afghan nationals present in the United States. PM-0192, at 2. "In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary." *Id.*

But, PM-0192 further provides, "USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe." [*28]

*Id.*

In response to the asserted vetting failures, "USCIS has determined" that it needs "to address vulnerabilities" and "conduct a comprehensive review of all policies, procedures, and guidance," and that in order to do so, "it must implement an adjudicative

hold on . . . pending benefit requests filed by aliens from high-risk countries outlined in

PP 10949." *Id.* Finally, PM-0192 says that "USCIS will conduct a thorough review on a

case-by-case basis to assess benefit eligibility including whether" the alien is listed in a

terrorist database; connected to banned organizations, activities, or individuals; or unable

to establish their identity because of the unreliability of documents from their country of

citizenship. *Id.* at 3. PM-0194 provided a bit more explanation and guidance on the final

consideration: "Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when

conducting security and background checks, and when reviewing civil documents [*29] . . . ."

PM-0194, at 4.

With respect to reliance interests, both memoranda say:

USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and appropriate, when weighed against the agency's obligation to protect and preserve our national security.

PM-0192, at 3; PM-0194, at 4.

This discussion does not suffice as a reasonable explanation for disregarding the reliance interest of people like Mr. Karimi who have been in this country for years-before the January 20, 2021, entry date for which the memoranda find comprehensive re-review is "necessary." The memoranda do not assert that comprehensive re-review for pre-2021 entries is needed-only that USCIS may extend the process outside this timeframe "when appropriate"-yet they indefinitely bar adjudication of benefit requests for all aliens from the identified countries regardless of entry date and without explanation for the unlimited time [*30] horizon. This is not the reasoned explanation the law requires.

Moreover, "[t]here is no evidence that Defendants considered reasonable alternatives to the expansive hold policy." *Varniab*, 2026 WL 485490, at *19. In sum,

USCIS has offered no explanation for why its blanket suspension of adjudications is a rational precursor to reviewing its policies and re-reviewing applications on a case-by-case basis. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74 (D.D.C. 2025). The national security interests that the Policy purports to protect can hardly be served by making beggars out of legal immigrants who are likely to remain lawfully present in the United States indefinitely. ""If [an applicant present in the country] presents a threat to national security and public safety, the Government does not ameliorate that threat by delaying a decision . . . ." *Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1260 (W.D. Wash. 2026). Mr. Karimi is likely to succeed in showing that the Policy is arbitrary and capricious.

## B. Irreparable Harm

The Eighth Circuit has found irreparable harm where an alien "might be prevented from pursuing her chosen career." *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 929 (8th Cir. 2025) (citing *Terrace v. Thompson*, 263 U.S. 197, 215 (1923) (holding that the Constitution protected the right of an alien "to earn a livelihood by following the ordinary occupations of life," and finding that the alien suffered an irreparable harm when the "threatened [*31] enforcement of the law" prevented him from pursuing his desired occupation)). That is exactly what is happening here. Mr. Karimi has shown irreparable harm.

## C. Balance of the Equities and the Public Interest

"The balance-of-harms and public-interest factors 'merge when the Government'

. . . 'is the nonmoving party.'" *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022)

(quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, the Government asserts that its prerogatives and the public interest will be harmed because an injunction would "disrupt the orderly administration of immigration benefits by compelling Defendants to prioritize one applicant ahead of thousands of others awaiting adjudication." (Doc. 13, pp.

19-20).

As previously discussed, the Government cannot say whether there is actually a line for Mr. Karimi to jump, or whether the delay in adjudicating his application is in fact due to the Policy he challenges. Moreover, the Government has presented no evidence that Mr. Karimi himself presents a national security risk or has provided the kind of suspect documentation meriting more stringent review, so further delaying adjudication of his Form I-765 cannot be said to serve the national security interests behind the Policy. And with respect to administrative burden, PM-0194 [*32] announces numerous exceptions to the hold, including for certain Form I-765 applications and for "[b]enefit requests filed by aliens whose entry would serve a United States national interest." PM-0194, at 5. These exceptions indicate "that there is a mechanism already in place to continue to process applications notwithstanding PM-0192." *Varniab*, 2026 WL 485490, at *24. Accordingly, any burden on the Government of adjudicating Mr. Karimi's Form I-

2026 U.S. Dist. LEXIS 89358, *32

765 is slight in comparison to the heavy burden on Mr. Karimi of USCIS's continued withholding of a decision. These factors weigh in favor of a preliminary injunction.

## IV. CONCLUSION

Accordingly, Mr. Karimi's Motion for a Preliminary Injunction is **GRANTED IN PARTand DENIED IN PART**. The Court agrees that USCIS must decide Mr. Karimi's Form I-

765 application within a reasonable time but notes that USCIS may need to interview Mr.

Karimi to make a determination about his application, and, to the Court's knowledge, no interview has occurred. The Court therefore concludes that a longer period than requested is appropriate for USCIS's handling of Mr. Karimi's application.

For these reasons **IT IS ORDERED** that:

  Defendants and their officers, agents, affiliates, subsidiaries, servants, [*33] employees, successors, and all other persons or entities in active concert or privity or participation with them are hereby PRELIMINARILY ENJOINED from delaying or withholding adjudication of Mr. Karimi's Form I-765, Application for Employment Authorization based solely on his nationality pursuant to the adjudication hold policy described in Policy Memoranda PM-602-0192 and PM-602-0194 or any internal policy of USCIS operating to the same effect.    Within 30 days of the date of this Order, Defendants shall adjudicate Plaintiff's Form I-765 application and inform Mr. Karimi and this Court of the decision and, if denied, the reasons for denial.    Counsel for Defendants must provide written notice of this Order to all Defendants within 3 days of the date of this Order. Defendants must file a copy of the notice on the docket at the same time.     The Court finds that a bond is not required under Federal Rule of Civil Procedure 65(c) because Defendants did not request it or provide evidence that they are likely to suffer damages from the injunction.  IT IS SO ORDERED on this 23rd day of April, 2026.

_____

TIMOTHY L. BROOKS

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**